FILED
September 30, 2011
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
0003802818

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

WALTER & WILHELM LAW GROUP
a Professional Corporation
Riley C. Walter #91839
205 E. River Park Circle, Suite 410
Fresno, California 93720
Telephone:    (559) 435-9800
Facsimile:    (559) 435-9868
E-mail:    rileywalter@W2LG.com

Attorneys for SIERRA KINGS HEALTH CARE DISTRICT, Debtor

IN THE UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| In re<br><br>SIERRA KINGS HEALTH CARE DISTRICT,<br><br>            Debtor.<br><br>Tax ID#:   94-1529883<br>Address:    372 W. Cypress Avenue<br>           Reedley, CA 93654 | CASE NO.  09-19728-B-9<br><br>Chapter  9<br><br>DC No.: WW-64<br><br>Date:   November 10, 2011<br>Time:   9:00 a.m.<br>Place:   2500 Tulare St.,<br>        Courtroom #12<br>        Fresno, California<br>Judge:  Honorable W. Richard Lee |

**DISCLOSURE STATEMENT FOR THE PLAN
OF ADJUSTMENT DATED AS OF SEPTEMBER 15, 2011**

**I.
OVERVIEW**

The following pages summarize certain important information set forth elsewhere in this Disclosure Statement. Capitalized terms are defined in the text of the Disclosure Statement and in the Plan.

The Disclosure Statement contains important information that is not summarized in this Overview and that may influence your decision regarding whether to accept or reject the Plan or otherwise affect your rights. Please do not rely on this

1    Overview standing alone.  Please thoroughly read the entire document.

2          The Plan For The Adjustment Of Debts Of Sierra Kings Health Care District

3    Dated as of September 15, 2011 (the "Plan") proposed by Sierra Kings Health Care

4    District, a California Local Health Care District (the "Debtor" or "District" or "SKHCD"),

5    is premised on the Asset Sale Agreement ("ASA") and Lease, which is described

6    below, by and between the District and Adventist Health Central Valley Network

7    ("AH"), ("the Transaction").

8          The Lease and ASA describes a sale of the District's personal property assets

9    of the District and a lease with option to purchase certain of the District's real

10   property.  The District's Board of Directors ("Board") approved a Memorandum of

11   Understanding ("MOU") relating to the Transaction on February 2, 2011 and

12   approved a Letter of Intent ("LOI") on April 14, 2011.  A ballot measure authorizing

13   the Board to enter into the ASA and Lease was passed by the voters of the District

14   on June 7, 2011.  Over 95% of those voting approved the measure.  The U. S.

15   Bankruptcy Court granted the District's request for authority to lease the District's real

16   property at fair rental value on March 24, 2011, subject to Board approval and voter

17   approval.  The Transaction is expected to close on or about October 31, 2011.

18         As of the date of this Disclosure Statement the definitive sale and lease

19   agreements were being finalized.  The definitive sale/lease documents will be posted

20   on the website for review at http://skhcd.W2LG.com.  A summary of the economic

21   terms of the sale and lease is given below.  The LOI summarizing the terms of the

22   Transaction is attached as Exhibit A.  The reference herein to ASA means the

23   Transaction. Any capitalized term not otherwise defined in this Disclosure Statement

24   has the meaning ascribed to it in the Plan.  Unless otherwise indicated, references

25   in this Disclosure Statement to "Sections" are references to the various enumerated

26   Sections of this Disclosure Statement.

27

## Key Terms

| | |
|---|---|
| **Debtor** | Sierra Kings Health Care District, a California Local Health Care District. |
| **Bankruptcy Court** | United States Bankruptcy Court for the Eastern District of California, Fresno Division. |
| **Purpose of the Disclosure Statement** | To provide information of a kind, and in sufficient detail, that would enable a typical holder of claims in a class impaired under the Plan to make an informed judgment with respect to voting on the Plan. |
| **Balloting Information** | Ballots have been provided with this Disclosure Statement to creditors known to have claims that are impaired under the Plan.  Ballots must be returned to and received by the Ballot Tabulator by the date that will be set out on a separate Order. |
| **Ballot Tabulator** | Peg T. Watson, Senior Paralegal, Walter & Wilhelm Law Group, 205 East River Park Circle, Suite 410, Fresno, California 93720 (facsimile: 559-435-9868). |
| **Confirmation Hearing and Confirmation Objections** | A hearing regarding confirmation of the Plan will be held by the Bankruptcy Court on the date that will be set out on a separate Order. |
| **Partnership Claims** | As a result of the motion by which Bloss Memorial Healthcare District assumed all liability for the debts of the dental surgery center, the District was relieved of about $3,074,856 in claims.  By agreement with Bloss Memorial Healthcare District, all Claims against the former partnership have been paid by Bloss. |
| **Revenue Bonds** | The District owes approximately $6,890,000 on the 2006 A and B Series Revenue Bonds.  The Bank of New York Mellon Trust Company, N.A. ("Bank of New York Mellon") is the indenture trustee.  These bonds will be defeased as a part of the Transaction.  These bondholders will be unimpaired by the Plan. |
| **General Obligation Bonds** | The District is obligated on three issues of general obligation bonds. |
| | a)      Sierra Kings Health Care District General |

Obligation Bonds, Election of 2000, Series 2002

b)     Sierra Kings Health Care District General Obligation Bonds, Election of 2006, Series 2007

c)     Sierra Kings Health Care District General Obligation Bonds, Election of 2006, Series 2009

Principal and interest on these general obligation bonds are paid from property tax revenues. Each bond is current and has been current since it was issued.

The amount owed on each issue as of August 1, 2011 is:

| | | |
|---|---|---|
| a) | 2002 | $5,265,000 maturity 2032 |
| b) | 2007 | $16,000,000 maturity 2037 |
| c) | 2009 | $4,000,000 maturity 2039 |

All of the general obligation bond proceeds have been expended except for the 2009 bonds which will be used in accordance with the bond documents. The general obligation bond holders will be unimpaired by the Plan.

**Allowed Administrative Convenience Claims**

Attached as Exhibit B is a spreadsheet showing the claims included in Class 8. Class 8 claims are Allowed General Unsecured Claims in an amount not exceeding $3,000. Class 8 Allowed Claims are unimpaired.

**Allowed General Unsecured Claims**

Attached as Exhibit C is a spreadsheet showing the claims included in Class 9. As of September 15, 2011, less than $1,000,000 remained unresolved and disputed. The District believes the ultimate total amount of claims to be allowed in Class 9 will be about $3,230,000 to $4,000,000, plus possible lease and contract rejection claims. Exhibit C shows the timely filed general unsecured claims that have and have not been resolved. This is only an estimate.

To the extent that there is any inconsistency between the Plan (including the Exhibits and any supplements to the Plan) and the description in the Disclosure

---

Statement, the terms of the Plan (including the Exhibits and supplements to the Plan)
will govern.

## II.
## SUMMARY OF THE PLAN

Assuming the closure of the sale to AH, the Plan is as follows:

### Sale Proceeds

Expected funds on hand at close of Transaction    $13,336,100
                                                  -----------------

Less payments for:
Defeasance of 2006 Revenue Bonds (Class 1)    -    7,300,000
Final payroll and related benefits            -    1,000,000
Insurance premiums                            -      933,000
Administrative expenses                       -    1,100,000
Professional fees                             -      100,000
                                                  -----------------
Total payments                                    10,433,000
                                                  -----------------
                                                   2,903,100
                                                  -----------------

Less reserves for:
Operations through December 31, 2012          -      757,190
        Personnel Costs/Plan
        Administrator              $115,250
        Legal and professional fees 228,000
        Run out employee benefit costs 368,000
        Insurance                    32,040
        Other - Office Setup         13,900
Contingency                                   -      100,000
USDA loan payments for 2012 (Class 7)         -      141,960
                                                  -----------------
Total retention                                      999,150
                                                  -----------------
                                                   1,903,950
                                                  -----------------

Less payments on claims:
Class 5 - SSA Plan #1                         -    1,314,988
Class 6 - ZCI                                 -      332,114
Class 8 - Administrative convenience          -       59,081
                                                  -----------------
Total payments on claims                           1,706,183
                                                  -----------------
Expected Cash on hand at December 31, 2011           197,767
                                                  -----------------

//

---

Class 9 - Treatment

Thus, as of the Effective Date of the Plan the District will have the retention amount shown above and expected cash on hand ($954,957). It will then receive during 2012 the rents on a monthly basis and *ad valorem* tax revenues, net of payments to Classes 2, 3 and 4. From this sum, on or before December 31, 2012, the District will then pay ongoing operational expenses and then pay the balance of the allowed Class 6 Claim to ZCI, keep payments to NSDA on Class 7 current and pay $800,000 toward the Class 9 claims.

From rents and *ad valorem* tax revenues, in 2013, 2014 and 2015 the District will retain $192,000 for all District operations, plan administration and compliance with district laws and retain $122,000 to pay the ongoing Class 7 claim of USDA, and distribute no less than $800,000 per year to Class 9 until Class 9 is fully satisfied. Based on its projections as to the ultimately allowed Class 9 claims, the District believes Class 9 will be satisfied within 3.25 to 4.0 years from December 31, 2012.

## III.
## INTRODUCTION

The District filed a petition under Chapter 9 of title 11 of the United States Code (the "Bankruptcy Code") on October 8, 2009 (the "Petition Date"), which was designated Case Number 09-19728-B-9 (the "Chapter 9 Case"). An order for relief was entered on February 3, 2010, and the Chapter 9 Case is currently pending before the United States Bankruptcy Court for the Eastern District of California, Fresno Division (the "Bankruptcy Court").

The District is the proponent of the Plan. The Bankruptcy Court has determined that the Disclosure Statement contains "adequate information" within the meaning of Section 1125 of the Bankruptcy Code and authorized the District to

1 transmit it to holders of impaired claims in connection with the solicitation of votes

2 with respect to the Plan.

3       As described more fully elsewhere in this document, the District believes that

4 the Plan provides the greatest and earliest possible recoveries to holders of claims,

5 that acceptance of the Plan is in the best interests of all parties, and that any

6 alternative restructuring or reorganization would result in delay, uncertainty, expense,

7 litigation and, ultimately, smaller or no distributions to creditors.  Accordingly, the

8 District urges you to cast your ballot in favor of the Plan.

9       **A.    The Purpose of this Disclosure Statement.**

10      The Bankruptcy Code generally requires that the proponent of a plan of

11 adjustment prepare and file with the Bankruptcy Court a "Disclosure Statement" that

12 provides information of a kind, and in sufficient detail, that would enable a typical

13 holder of claims in a class impaired under that plan to make an informed judgment

14 with respect to the Plan.  This Disclosure Statement provides such information.

15 Parties in interest should read this Disclosure Statement, the Plan, and all of the

16 exhibits accompanying such documents in their entirety in order to ascertain:

17           1.    How the Plan will affect their claims against the District;

18           2.    Their rights with respect to voting for or against the Plan;

19           3.    Their rights with respect to objecting to confirmation of the Plan;

20                 and

21           4.    How and when to cast a ballot with respect to the Plan.

22      This Disclosure Statement does not provide creditors with legal or other

23 advice or inform such parties of all aspects of their rights. Claimants are advised to

24 consult with their attorneys and/or financial advisors for advice as to their best course

25 of action with respect to the Plan.

26      This Disclosure Statement has been prepared in good faith and in

27

28

1   compliance with applicable provisions of the Bankruptcy Code. Based upon

2   information currently available, the District believes that the information contained in

3   this Disclosure Statement is correct as of the date it was filed. The Disclosure

4   Statement, however, does not and will not reflect events that occur after the date of

5   the Disclosure Statement (and, where indicated, specified earlier dates), and the

6   District assumes no duty and presently does not intend to prepare or distribute any

7   amendments or supplements to reflect any such events.

8       **B.**     **Voting on the Plan and of Certain Requirements Necessary for Confirmation of the Plan.**

9

10       Holders of Allowed Claims in Classes (collectively, the "Voting Classes")

11   are entitled to vote on the Plan, because the Claims in each such Class may be

12   "impaired" under the Plan under of Section 1124 of the Bankruptcy Code.

13   Unimpaired classes are not entitled to vote.

14       The Plan may be confirmed only if at least one Class of impaired claims

15   has voted to accept the Plan (without counting the votes of any insiders) and if certain

16   statutory requirements are met. A Class of claims accepts the Plan when at least

17   one-half in number and at least two-thirds in amount of the Allowed Claims actually

18   voting in that Class vote in favor of the Plan.

19       In the event of a rejection of the Plan by any of the Voting Classes, the

20   District will request that Plan be confirmed in accordance with those portions of

21   Section 1129(b) of the Bankruptcy Code that are applicable, which provisions permit

22   confirmation by a process known as "cramdown" notwithstanding such rejection if the

23   Bankruptcy Court finds, among other things, that the Plan "does not discriminate

24   unfairly" and is "fair and equitable" with respect to each rejecting Class. Other

25   sections of this Disclosure Statement provide a more detailed description of the

26   requirements for acceptance and confirmation of the Plan.

27

**C.    Voting Procedures, Balloting Deadline, Confirmation Hearing, and Other Important Dates; Deadlines, and Procedures.**

**1.    Voting Procedures And Deadlines.**

The District has provided copies of this Disclosure Statement and ballots to all known holders of impaired claims in the Voting Classes. Those holders of an Allowed Claim in each of the Voting Classes who seek to vote to accept or reject the Plan must complete a ballot and return it to Peg T. Watson, Senior Paralegal, Walter & Wilhelm Law Group, 205 East River Park Circle, Suite 410, Fresno, California 93720 (facsimile: 559-435-9868) (e-mail: skhcdballot@W2LG.com) (the "Ballot Tabulator") so that their ballots actually are received by no later than the Balloting Deadline (as defined below). Ballots do not constitute proofs of claim and must be returned directly to the Ballot Tabulator, not to the Bankruptcy Court.

*All ballots, including ballots transmitted by e-mail or facsimile, must be completed, signed, returned to, and actually received by the Ballot Tabulator by not later than the deadline set by the Court as indicated in the Order approving the Disclosure Statement (the "Balloting Deadline"). Ballots received after the Balloting Deadline, and ballots returned directly to the Bankruptcy Court shall not be counted. E-mailed ballots must be sent to skhcdballot@W2LG.com. Ballots sent by facsimile must be faxed to 559-435-9868, attention Peg T. Watson.*

**2.    Date of the Confirmation Hearing and Deadlines for Objection to Confirmation of the Plan.**

The date and time of the hearing to determine whether the Bankruptcy Court will confirm the Plan (the "Confirmation Hearing") is set out on the Notice and will be held in the Courtroom of the Honorable W. Richard Lee, United States Bankruptcy Judge, Courtroom 12, Fifth Floor, 2500 Tulare Street, Fresno, CA 93721.

1    The Confirmation Hearing may be continued from time to time without further notice

2    by announcement in open Court.

3            Objections to confirmation of the Plan must be filed with the Bankruptcy

4    Court and served on the following persons so as to be received by the deadline set

5    out in the Notice of Hearing on Confirmation: (a) Sanford Haskins, Interim Chief

6    Executive Officer of the District, 372 West Cypress Avenue, Reedley, California

7    93654; e-mail: shaskins@skdh.org; (b) Walter & Wilhelm Law Group, 205 East River

8    Park Circle, Suite 410, Fresno, California 93720 (phone: 559-435-9800; facsimile:

9    559-435-9868; email: rileywalter @W2LG.com), Attention: Riley C. Walter, (counsel

10   to the District); (c), Fishman, Larson, Goldring & Zeitler, 7112 N. Fresno Street, Suite

11   450, Fresno, CA 93720 (phone: 559-256-5000; facsimile: 559-256-5005; email:

12   goldring@flgz.net, Attention Michael Goldring (District General Counsel); (d), Latham

13   & Watkins, 355 South Grand, Los Angeles, California 90071 (phone: 213- 891-8762;

14   facsimile: 213- 891-8763; email: settlemayer@lw.com, Attention: Daniel Settlemayer,

15   (counsel to Adventist Health); and (e) United States Trustee's Office, United States

16   Courthouse, 2500 Tulare Street, Suite 1401, Fresno, California 93721-1318; e-mail:

17   ustpRegion17.fr.ecf@usdoj.gov.

18           **D.     Important Notices and Cautionary Statements.**

19           1.      The historical financial data relied upon in preparing the Plan and

20   this Disclosure Statement is based upon the District's books and records. Although

21   certain professional advisors to the District assisted in the preparation of this

22   Disclosure Statement, in doing so such professionals relied upon factual information

23   and assumptions regarding financial, business, and accounting data provided by the

24   District and third parties, much of which has not been audited.  The professional

25   advisors of the District have not independently verified such information and,

26   accordingly, make no representations or warranties as to its accuracy.  Moreover,

27

28

although reasonable efforts have been made to provide accurate information, the District does not warrant or represent that the information in this Disclosure Statement, including any and all financial information and projections, is without inaccuracy or omissions, or that actual values or distributions will comport with the estimates set forth herein.

2.   No person may rely upon the Plan or this Disclosure Statement or any of the exhibits to the Plan for any purpose other than to determine whether to vote in favor of or against the Plan.  Nothing contained in such documents constitutes an admission of any fact or liability by any party, and no such information will be admissible in any proceeding involving the District or any other party.

E.    **Additional Information.**

If you have any questions about the procedures for voting on the Plan, desire another copy of a ballot, or seek further information about the timing and deadlines with respect to confirmation of the Plan, please write to counsel for the District as follows:  Riley C. Walter, Walter & Wilhelm Law Group, 205 East River Park Circle, Suite 410, Fresno, California 93720 (facsimile: 559-435-9868; email: rileywalter@W2LG.com).

**IV.**
**BACKGROUND INFORMATION**

A.    **The District.**

The District is a public agency, formed under the State of California Local Healthcare District Law.   The geographic area covered by the District encompasses approximately 234,000 square acres in the southeast portion of Fresno County and includes the city of Reedley as well as a portion of the neighboring city of Parlier.   The permanent resident population of the District is estimated to be approximately 40,000 persons.  At the start of the Chapter 9 Case, and presently, the

District owned and operated a hospital in Reedley, a birthing center and five rural health clinics (collectively referred to herein as the "Health Facilities"). It was, but is no longer, a partner in a dental surgery center venture.

The voters of the District elect the Board of Directors.

The Debtor currently operates a 49 bed hospital and 5 rural health clinics, of which 20 beds are designated as perinatal services and 29 beds are designated as unspecified general acute care. Of the 29 unspecified general acute care beds, 12 are approved to be utilized as swing beds.

The District opened a new emergency department and outpatient clinic and a state of the art radiology center in January 2010, as well as an 8 bed labor and delivery unit and nursery.

The District is governed by a five-member Board of Directors. The current members of the Board are Kathleen Omachi (Chair), Forrest Brown, Jacob H. Friesen, M.D., Israel Lara (Vice Chair) and James Lundy. Day-to-day operations are conducted by the District's management team. The fact that the Board is elected by the public causes both problems and opportunities that are generally associated with local government entities. Its governing body and senior staff undergo much closer public scrutiny and must devote more time to public affairs than would be the case if it were a private entity. On the other hand, as a local public entity, local residents tend to be supportive of the District.

The senior management of the District presently is Sanford Haskins, Interim Chief Executive Officer, Teresa Jacques, Interim Chief Financial Officer, Belinda Cano, Executive Director of Clinics and Susan Chapman, Interim Chief Nursing Officer.

Medical staff for the hospital includes independent physicians and licensed healthcare professionals. The District employs 324 people, working the

1  equivalent of 210 full time employees. The District is a major employer in the

2  Reedley area. The District averages 1,250 emergency department visits per month

3  and averages 12 inpatients per day.

4          Like many small hospital districts, the District has struggled financially

5  for years, showing an increase (decrease) in net assets of $265,135 for fiscal 2008,

6  ($3,018,963) for fiscal 2009 and ($1,406,584) for fiscal 2010 including tax revenues.

7  For fiscal 2011, the unaudited net loss was narrowed to less than $900,000 which did

8  not include about $800,000 of funding received subsequent to June 30, 2011 on

9  account of services rendered prior to June 30, 2011.

10          Like most small rural hospitals in California, the District faces immense

11  financial pressures. Payment reductions by federal and state government and

12  insurance programs, and increased regulatory requirements have substantially

13  negatively changed the hospital operating environment.

14          The District's residents desire and require nearby emergency, urgent

15  and acute care services. To provide these services, the District must actively

16  participate in developing and maintaining a panel of primary care and specialty

17  physicians within the District and maintain and upgrade its medical,

18  obstetrics/gynecology, imaging, laboratory equipment, physical plants, and rural

19  health clinics.

20          Under law, hospitals are required to treat any person who presents at

21  the emergency room without regard to the patient's ability to pay for services. The

22  District absorbs the costs of medical care for uninsured patients who account for

23  approximately 9% of its volume.

24          Medi-Cal and Medicare programs, which represent 74% of total

25  revenue, are highly regulated and controlled, are subject to frequent changes in

26  reimbursement levels based upon actions of the California Department of Health

27

1  Care Services, the U.S. Department of Health and Human Services (CMS) and

2  Congress. In addition, many private insurers base their payment schedules on a

3  percentage of Medicare rates. Payment reductions by Medi-Cal and Medicare

4  negatively affect District revenue.

5          Senior management experienced a large turnover in the fall of 2009.

6  The Chief Executive Officer was Pamela Ott until September 2009 when Sanford

7  Haskins became Interim Chief Executive Officer. Additionaly Teresa Jacques

8  became the District's Interim Chief Financial Officer, replacing Barbara Jennings.

9  Ms. Ott and Ms. Jennings were terminated by the District in 2009. Oleh

10  Wolowoodiuk, M.D. is the Chief of the Medical Staff.

11          Provision of quality health services to District residents is the primary

12  goal of the District and necessary to the community, in part, because of the relative

13  rural location of the District. The residents need emergency room, inpatient, obstetric

14  and other ancillary services. The critical nature of the need for heath care services

15  requires the Board to place a high priority on the continued financial viability of the

16  District.

17      **B.      District's Financial Problems.**

18          At the time the District's Board of Directors considered filing a Chapter

19  9 petition, the District was facing a liquidity crisis that threatened its continued

20  operations. The Board concluded that filing a Chapter 9 was the only available

21  remedy to avoid continued litigation with and collection action by creditors, while, at

22  the same time, allowing the District to protect its assets, preserve its business

23  operations and continue providing uninterrupted healthcare services to its patients

24  while it developed a comprehensive business plan. The task of restructuring the

25  District is particularly complicated and time consuming because of the multitude of

26  financial and contractual relationships inherent in the hospital enterprise.

27

28

The decision to file Chapter 9 came only after the District attempted alternatives that would have avoided such a filing as the District was nearly out of cash and unable to meet payroll or purchase vital medical supplies.

## V.
## THE DISTRICT'S CHAPTER 9 CASE

### A.     Formation of the Committee.

The United States Trustee appointed the members of the Creditors' Committee (the "Committee"). The Committee consists of the following members: (a) Bill Able, Bloss Memorial; (b) Guy Patzke, Krueger International, Inc.; (c ) Sarvamitra Awasthi, M.D.; (d) Douglas Dietzen, GE Healthcare; and (e) Oleh J. Wolowodiuk, M.D., P.C.

### B.     Dissolution of the Dental Surgery Center Partnership.

On September 21, 2010, the Court approved a Stipulation and Order which provided for Bloss Memorial Healthcare District to assume sole liability on all claims against the dental surgery center partnership known as Sierra Kings Dental Surgery Center in exchange for cancellation of the District's partnership interest. This relieved the District of $3,074,856 of claims.

### C.     Motions for Relief from the Stay,

Several motions requesting relief from the automatic stay have been filed. When the movant agreed both to liquidate its claim in another forum and not to enforce any claim so liquidated against assets or property that were the District's but rather, to look exclusively to insurance policy proceeds, the District stipulated to relief from the stay being granted. As of the date of this Disclosure Statement there were no motions on file seeking relief from the automatic stay of Section 362 not previously resolved.

//

---

D.   **Bond Compromises.**

By orders entered December 23, 2009, September 13, 2010 and January 13, 2011, the District agreed to treat its revenue bond and general obligation bond debts as unimpaired, as is discussed below.

E.   **Jablonsky Litigation.**

On March 18, 2010, Robert Jablonsky, M. D. asserted a claim against the District in the amount of $500,000 based on "Personal Injury—Civil Rights." Dr. Jablonsky is a former member of the District's medical staff. The claim arose out of the circumstances surrounding the suspension and permanent revocation of his staff privileges in 1997. Long and protracted litigation then ensued including the District's pending Objection to the proof of claim filed by Dr. Jablonsky.

The claim, if any, is disputed and being defended by insurance defense counsel. On July 15, 2011 the U.S. District Court dismissed the claim of Dr. Jablonsky and Dr. Jablonsky has filed an appeal to the Ninth Circuit Court of Appeals. While the District expects the several orders of the trial court to be upheld and there will be no distribution on this claim, however, until a final order is entered the District must presume this disputed claim may be allowed.

F.   **Lemus Litigation.**

On February 20, 2009, Gloria Hernandez Lemus, individually, and as Guardian Ad Litem for Christina Adrian Lemus, filed a medical malpractice and wrongful death action against the District. The complaint alleges that the District and physician, negligently caused the wrongful death of Enrique Lemus Ledesma. Lemus is seeking general damages, damages for loss of consortium, and funeral expenses.

On January 19, 2010 Lemus filed a proof of claim against the District in the amount of $250,000 to protect her interest in a potentially favorable judgment from the medical malpractice and wrongful death action. The underlying civil action

1   was filed in Fresno County Superior Court with a jury trial scheduled to begin January

2   30, 2012. An objection to this claim is pending.

3       The claim is disputed and covered by the District's liability insurance and

4   there will be no distribution on this claim from the District.

5      **G.    Cordova Litigation.**

6       On April 13, 2010, David Cordova filed a medical malpractice against

7   the District in Fresno County Superior Court. The complaint alleges that the District

8   and physician were responsible, negligently or in some other actionable manner, for

9   events which caused injury to David Cordova. Cordova is seeking monetary

10   remedies for general damages, medical, hospital and related expenses incurred and

11   to be incurred, for loss of past and future earnings and earning capacity; for cost of

12   suit incurred herein; and for such other and further relief.

13       The claim is disputed and covered by the District's liability insurance.

14      **H.    Ocejo Litigation.**

15       On August 16, 2010, Francis Ocejo, individually, and as Guardian ad

16   Litem for Crystal Ocejo and Francisco Ocejo, Jr., filed a medical malpractice and

17   wrongful death action against the District in Fresno County Superior Court (Case No.

18   11CECG00573.) The complaint alleges that the District and others were negligent

19   in the failure to properly assess and treat Benina Isabel Alvarez-Ocejo for cardiac

20   infarction. Ocejo is seeking general damages, wage loss, hospital and medical

21   expenses, loss of earning capacity, and loss of household services.

22       The claim is disputed and covered by the District's liability insurance.

23      **I.    Other Threatened Litigation.**

24       **1.    Herrera-Soto Litigation.**

25       On December 3, 2010, Rosa Herrera, individually, and Juan A. Soto as

26   Guardian ad Litem for Alex Soto, a minor, filed a notice of intent to commence legal

27

28   DISCLOSURE STATEMENT FOR THE PLAN OF             M:\S-U\Sierra Kings Health Care
    ADJUSTMENT DATED AS OF SEPTEMBER 15, 2011     17     District\Confirm\Final\DisclosureStatement.
                                                  ptw.092811.wpd

action against the District in Fresno County Superior Court. The threatened complaint alleges negligent injury to the fetal mother causing harm to the fetus; negligent infliction of emotional distress; fraud. Herrera is seeking general and special damages, and medical expenses and the disputed claims are expected to be covered by liability insurance, if not time barred. The District objects to this claim.

### 2. Woolsley Litigation.

On or about August 3, 2011 the District was notified of an asserted medical malpractice claim filed on behalf of Lauren M. Woolsley. The District has denied the asserted claim and will object to the administrative expense claim filed on behalf of Woolsley. The disputed claim, if any, is expected to be covered by liability insurance.

### 3. SSA #1 Litigation/Compromise.

The District and Successor Trustees of SSA #1 have agreed to compromise and settle claims between them relative to the District's failure to remit withholdings to the SSA #1 Plan and failure to make required contributions. They have agreed to settle this dispute and to release all claims against the District and related persons and former and current Trustees, except for Lee Scott and HSC Securities, in exchange for prompt payment by the Effective Date to the Successor Trustees for benefit of the SSA #1 beneficiaries, payment of surrender fees to John Hancock Life Insurance Company and payment of certain fees and costs. The compromise treatment agreed upon is described below for Class 5. This will make the Plan and beneficiaries whole.

### 4. ZCI/MSI/Aspen Litigation/Compromise.

In 2001, the District undertook a facility expansion project. The District retained Aspen Street Architects, Inc. ("Aspen Street"), to provide planning, design, and construction administration services for the expansion project. In 2007, Debtor

1   entered into a contract with Zumwalt Construction, Inc. ("ZCI"), for construction

2   related to the expansion project. ZCI subcontracted with Modular Structures

3   International, Inc. ("MSI") to fabricate modular structures for the expansion project.

4   There was a significant delay in the completion of the expansion project which

5   caused additional expense. The cause of the delay is disputed. ZCI and MSI attribute

6   the delay to Aspen Street, which denies the assertion.

7          ZCI asserted a proof of claim against the District in the amount of

8   $2,292,560 for direct and indirect costs including a pass through amount for MSI

9   attributed to the extended duration of the project.  MSI also asserted a proof of claim

10   against the District on April 30, 2010 in the amount of $791,150 for lost profits

11   resulting from the delay. Aspen Street asserted a proof of claim against the District

12   on April 28, 2010 in the amount of $64,790 for services rendered. The District

13   contends that if the damages claimed were caused by Aspen Street, Aspen Street

14   is obligated to indemnify the District for those claims.

15          The District has objected to all three claims and asserted counterclaims

16   against each party. The District has filed a Motion to Consolidate these contested

17   matters.

18          On July 30, 2010, MSI filed for Chapter 7 bankruptcy in the Northern

19   District of Texas, which gave rise to an automatic stay which was subsequently

20   relieved in favor of MSI's bonding company.  The District has also sought relief from

21   stay from the Court presiding over the MSI Chapter 7 proceeding.

22          On September 12, 2011 the District reached a compromise agreement

23   with ZCI that ZCI would settle the pass through claim of MSI and the fraud, lien, make

24   whole, bond and other claims of ZCI would be settled, leaving only the claims of and

25   against Aspen Street Architects.

26          The agreement with ZCI results in the treatment of Class 6, as

27

described below, which provides for payment of the compromise sum in stages.

The District will continue to seek an affirmative recovery from Aspen Street Architects and the recovery, if any, net of fees and costs, will be applied to the Class 6 claim.

**J.    Borrowings.**

During the course of the Chapter 9 proceeding the District was authorized to borrow money from Adventist Health and repaid the same. Any sums owing between the District and AH on account of administrative expense claims will be set off at the closing of the Transaction.

**VI.**
**THE DISTRICT'S LIABILITIES AND ASSETS**

Set forth below is a summary of the liabilities and assets that are relevant to the Plan.

**A.    Liabilities.**

**1.    Proofs of Claim.**

The Bankruptcy Court established April 30, 2010 as the deadline for filing proofs of claim against the District. By subsequent order, the Bankruptcy Court established June 15, 2010 as the supplemental bar date for claims filed by certain employees or former employees involved with the SSA Plan #1 who did not receive notice of the initial bar date.

**2.    Administrative Expenses.**

As of the date this Disclosure Statement was filed, the District owed approximately $1,100,000 in administrative expenses allowable under Section 507(a)(2) for goods and services provided post petition. Additional sums will be incurred at close of the Transaction to pay final payroll related expenses and benefits, and provide for insurance coverage continuation upon close of the

---

Transaction. Reserves for these items is provided for and described on page 25, et seq. The amount may increase depending on the sums needed to cure arrearages, if any, so that executory contracts and unexpired leases can be assigned to AH.

### 3.  Secured Claims.

The United States Department of Agriculture holds a note secured by a deed of trust on a portion of the District's real property at 550 W. Cypress, Reedley, California. The amount owed as of July 23, 2011 was $1,483,523 and the monthly debt service payment is $10,140 and is current. This building is leased out and the rent received covers the monthly payment. AH assumed the lease and the District will continue to service the debt. The USDA claim is unimpaired by the Plan.

### 4.  SSA Plan #1 Claims.

186 current and former employees filed priority claims against the District on account of funds that were deducted from their pay for the Social Security Alternative Plan #1 (SSA #1) but not deposited into SSA #1 and on account of contributions that were due from the District but not remitted to the SSA #1 accounts. The District objected to these claims and the objections were sustained. These claims totaling $1,314,998 were allowed and these will be paid in Class 5 pursuant to the compromise settlement with the Successor Trustees, as discussed below.

### 5.  Dental Surgery Center Partnership Claims.

As a result of a motion by which Bloss Memorial Healthcare District assumed all liability for the debts of the dental surgery center partnership, the District was relieved of about $3,074,856 in claims. There are no such claims remaining.

### 6.  Revenue Bonds.

The District owes $5,890,000 on 2006 A and B Revenue Bonds on which Bank of New York Mellon is the trustee. This obligation is current and is secured by certain personal property of the District.

---

**7. General Obligation Bonds.**

The District is obligated on three (3) general obligation bond series:

a) Sierra Kings Health Care District General Obligation Bonds, Election of 2000, Series 2002

b) Sierra Kings Health Care District General Obligation Bonds, Election of 2006, Series 2007

c) Sierra Kings Health Care District General Obligation Bonds, Election of 2006, Series 2009

The General Obligation Bonds are serviced from property tax revenues. Each such bond is current and has been kept current since it was issued. There has been no default in payment.

The amount owed on each are:

a) Series 2002    $ 5,265,000 - maturity 2032

b) Series 2007    $16,000,000 - maturity 2037

c) Series 2009    $ 4,000,000 - maturity 2039

All of the general obligation bond proceeds have been expended except $3,885,698 of 2009 Series bonds proceeds, as of June 30, 2011, which will be used in accordance with the Bond Documents.

**8. Aspen Street.**

The allowed amounts of any remaining claims of Aspen Street, if any, resulting from the construction litigation described above will be included in the general unsecured claims class (Class 9). (The treatment of Class 6 provides ZCI with a separate claim per the settlement reached on September 12, 2011.) The exposure on this general unsecured claim ranges from a positive recovery of $250,000 to up to $65,000 in general unsecured claims and the outcome will either be determined by settlement or litigation. Any positive recovery will be paid out to

---

1    Class 6, net of any fees and expenses incurred.

2              **9.      Administrative Convenience Claims.**

3              Attached to the Plan as Exhibit B Is a spreadsheet showing the

4    claims included in Class 8. Class 8 claims are Allowed General Unsecured Claims

5    in an amount not exceeding $3,000 totaling approximately $59,081. Class 8 Allowed

6    Claims shall be paid in full within fourteen days of the Effective Date.

7              Class 8 is unimpaired by this Plan and, accordingly, the holders

8    of Allowed Claims classified into Class 8 are not entitled to vote their Allowed

9    Administrative Convenience Claims to accept or reject this Plan.

10             **10.     General Unsecured Claims.**

11             Attached to the Plan as Exhibit C is a spreadsheet showing the claims

12   included in Class 9. As of September 15, 2011 about $3,000,000 +/- such claims

13   had been resolved and fixed and less than $1,000,000 remained unresolved and

14   disputed. The District believes the ultimate total amount of claims to be allowed in

15   Class 9 will be between $3,000,000 to $4,000,000, but it could be more, or less.

16   Exhibit C shows the timely filed general unsecured claims that have and have not

17   been resolved. Additional general unsecured claims may result from rejections of

18   leases and executory contracts, construction litigation and other litigation claims.

19   This is an estimate.

20             **11.     Leases/Executory Contracts**

21             The District has previously assumed and rejected various leases and

22   executory contracts and is in the process of resolving the remaining agreements.

23   See Exhibit D to the Plan for a listing of the Assumed Executory Contracts and

24   Leases. There are numerous other such agreements that have not yet been

25   addressed. Any unexpired lease or executory contract not otherwise assumed will

26   be deemed rejected and the resulting claim must be filed within 30 days of the

27

1   Effective Date and such claims will be included in Class 9.

2              **12.    Statement Regarding Liabilities.**

3              The District disputes a number of the claims that have been asserted

4   against it. The District's review and analysis of claims is ongoing. Given the

5   uncertainties inherent in any litigation, no assurance can be given regarding the

6   successful outcome of any litigation that may be initiated in objection to such claims

7   or regarding the ultimate amount of unsecured claims that will be allowed against the

8   District.

9              As described below, the Plan enables the District to file objections to

10  claims at any time within (90) days after the Effective Date. The Plan also provides

11  for the District to retain any and all defenses, offset and recoupment rights, and

12  counterclaims that may exist with respect to any disputed claim, whether under

13  Section 502, 552, or 558 of the Bankruptcy Code or otherwise. The District reserves

14  all rights with respect to the allowance and disallowance of any and all claims. In

15  voting on the Plan, creditors may not rely on the absence of a reference in this

16  Disclosure Statement or the Plan or the absence of an objection to their proofs of

17  claim as any indication that the District ultimately will not object to the amount,

18  priority, security, or allowance of their claims.

19         **B.    Assets.**

20             The District's assets primarily consist of the hospital campus,

21  approximately four acres of unimproved land adjacent to the campus, fixed and

22  moveable equipment and personal property, working capital and five rural health

23  clinics. Deloitte Financial Advisory Services, LLP valued the personal property, rural

24  health clinics enterprise and fixed assets in a valuation report dated April 27, 2011

25  which served as a basis for the LOI.

26  //

27

28  DISCLOSURE STATEMENT FOR THE PLAN OF          M:\S-U\Sierra Kings Health Care
    ADJUSTMENT DATED AS OF SEPTEMBER 15, 2011     24     District\Confirm\Final\DisclosureStatement.
                                                         ptw.092811.wpd

1      By the Transaction, the District will sell to AH substantially all of its

2 personal property assets and clinics for $8,236,100 plus an amount equal to the

3 District's working capital at Closing. The District will also lease for fifteen years

4 certain real property for $800,000 annually, subject to escalation, with an option to

5 purchase the leased real property. The District will retain ownership of 4+/- acres

6 adjacent to the hospital campus.

7      The District's investigation regarding its potential claims and causes of

8 action against third parties are ongoing and not yet completed. These assets are

9 excluded from the Transaction.

10      Parties in interest may not rely on the absence of a reference in this

11 Disclosure Statement or Plan as any indication that the District ultimately will not

12 pursue any and all available claims and causes of action against them. All parties

13 who previously dealt with the District hereby are on notice that the Plan preserves

14 certain of the District's rights, claims, interests and defenses. The District expects

15 that any and all meritorious claims will be pursued and litigated after the Effective

16 Date to the extent they remain vested in the District.

17

**VII.**
**SUMMARY OF THE PLAN OF ADJUSTMENT**

18

19      The discussion of the Plan set forth below is qualified in Its entirety by

20 reference to the more detailed provisions set forth in the Plan and its exhibits, the

21 terms of which are controlling. Holders of claims and other interested parties are

22 urged to read the Plan and its exhibits, so that they may make an informed judgment

23 regarding the Plan.

24      The Plan is premised upon the ASA by and between the District and AH under

25 which AH will purchase substantially all of the operating assets of the Debtor, and

26 enter into a lease of the District's real property, excluding the approximately four

27

28

DISCLOSURE STATEMENT FOR THE PLAN OF         25       M:\S-U\Sierra Kings Health Care
ADJUSTMENT DATED AS OF SEPTEMBER 15, 2011             District\Confirm\Final\DisclosureStatement.
ptw.092811.wpd

1   acres of unimproved land adjacent to the campus.

2       The means by which the Plan will be implemented are set forth in more detail

3   below:

4       i.     At present SKHCD holds about $3,885,690 of 2009 Bond Proceeds. It

5            is intended these 2009 Bond Proceeds will be committed to works of

6            improvement as set forth in the Bond Documents prior to Confirmation.

7       ii.    The net cash expected at Closing will be about $13,336,100.

8       iii.    Beginning November 1, 2011, the annual lease payment will be

9            $800,000 payable in monthly installments of $66,667.   Rent for

10           November and December, 2011, when the Effective Date is expected

11           to occur, will be in addition to the net cash expected at closing.   The

12           District will also receive $100,000 in December 2011 from *ad valorem*

13           property taxes.

14       iv.    In order to obtain a release of the security interest in the sale proceeds

15           held on 2006 Revenue Bonds, an estimated $7,300,000 will be

16           deposited at closing to defease all of the 2006 Revenue Bonds, after

17           application of bond fund reserves.

18       v.

| | |
|---|---|
| Expected funds on hand at close of Transaction | $13,336,100 |
| Lease payments from November 1, 2011 to December 31, 2012 | +    933,334 |
| *Ad valorem* tax revenues | +    350,000 |
| | ---------------- |
| | 14,619,434 |
| | ---------------- |
| Less payments for: | |
| Defeasance of 2006 Revenue Bonds (Class 1) | -    7,300,000 |
| Final payroll and related benefits | -    1,000,000 |
| Insurance premiums | -      933,000 |
| Administrative expenses | -    1,100,000 |
| Professional fees | -      100,000 |
| | ---------------- |
| Total payments | 10,433,000 |

26   //

27

|  |  |  |  | 4,186,434 |
|---|---|---|---|---|
|  |  |  |  | --------------- |

Less reserves for:

| Fiscal 2012 operations | | - | 757,190 |
|---|---|---|---|
| Personnel Costs | $115,250 | | |
| Legal and professional fees | 228,000 | | |
| Run out employee benefit costs | 368,000 | | |
| Insurance | 32,040 | | |
| Other | 13,900 | | |

| Contingency | - | 100,000 |
|---|---|---|
| USDA loan payments | - | 141,960 |
| | | --------------- |
| Total reserves | | 999,150 |
| | | --------------- |
| | | 3,187,284 |

Less payments on claims:

| Class 5 - SSA Plan #1 | - | 1,314,988 |
|---|---|---|
| Class 6 - ZCI | - | 332,114 |
| Class 8 - Administrative convenience | - | 59,081 |
| | | --------------- |
| Total payments on claims at Effective Date | | 1,706,183 |
| | | --------------- |
| Available during 2012 | | 1,481,101 |
| | | --------------- |

viii.  Thus, as of the Effective Date of the Plan the District will have the retention amount shown above and expected cash on hand ($954,957). It will then receive during 2012 the rents on a monthly basis and *ad valorem* tax revenues, net of payments to Classes 2, 3 and 4. From this sum, on or before December 31, 2012, the District will then pay ongoing operational expenses and then pay the balance of the allowed Class 6 Claim to ZCI, keep payments to USDA on Class 7 current and pay $800,000 toward the Class 9 claims.

From rents and *ad valorem* tax revenues, in 2013, 2014 and 2015 the District will retain $192,000 for all District operations, plan administration and compliance with district laws and retain $122,000 to pay the ongoing Class 7 claim of USDA, and distribute no less than $800,000 per year to Class 9 until Class 9 is fully satisfied. Based on its projections as to the ultimately allowed Class 9 claims, the District believes Class 9 will be satisfied within 3.25 to 4.0 years from December 31, 2012.

Based on the assumption that the Class 9 Allowed Claims will range between $3,000,000 and 4,000,000 the expected payout will take between 3.25 and 4.0 years.

However, and in any event, if the Allowed Claims in Class 9 are greater the Plan

1    payments will be extended until all Allowed Claims are paid in full.

2         After the sale and after the Effective Date, SKHCD will continue as a California

3    Health Care District but will not operate any health care facilities without the consent

4    of AH or provide any health care activities until all creditors are paid, at which time

5    the District, by its Board, will then decide how to best use the remaining revenues and

6    assets of the District.

7         **A.    Classification And Treatment of Claims.**

8              **1.    Unclassified Claims.**

9                   Section II of the Plan governs the treatment of certain claims that

10   are not classified into Classes under the Plan.

11                   **a.    Administrative Expense Claims.**

12                   Administrative Expense Claims in a Chapter 9 Case are claims of the

13   kind described in Sections 503(b) and 507(2).  Section II.A. of the Plan provides for

14   the treatment of Administrative Claims.  Throughout the course of the Chapter 9

15   Case, the District has endeavored to satisfy administrative expenses as they became

16   due.  Accordingly, the District believes that most claims that otherwise would

17   constitute Allowed Administrative Claims previously have been or will be satisfied in

18   the ordinary course of business prior to the Effective Date.  Those not already paid

19   by the Effective Date will be paid from the Transaction sale proceeds.

20                   To the extent there are unpaid Administrative Claims, at the Effective

21   Date, unless the holder of an Allowed Administrative Claim agrees to a different

22   treatment, the District will pay to each holder of an Allowed Administrative Claim, in

23   full satisfaction, release and discharge of such claim, cash in an amount equal to

24   such Allowed Administrative Claim on the later of (i) the Effective Date, (ii) the date

25   on which such claim becomes an Allowed Administrative Claim, or as soon thereafter

26   as is practicable, and (iii) the date funds are available.

27

### b.    Professional Claims.

Professional Claims are claims of professionals for services rendered or expenses incurred in rendering such services in the Chapter 9 Case or incident to the Plan.

Section II.C. of the Plan provides that, pursuant to Section 943(a)(3) of the Bankruptcy Code, all Professional Claims must be disclosed and be reasonable and that, upon being deemed reasonable, the District will pay to each holder of a Professional Claim, in full satisfaction, release and discharge of such claim, cash in an amount equal to that portion of such claim that is deemed reasonable, except to the extent such claim previously has been paid or satisfied.

The District has generally paid the fees of its bankruptcy counsel, district counsel and other professionals during the Chapter 9 Case.

### c.    Bar Date for Assertion of Requests for Payment of Administrative Claims (Other than Ordinary Course Administrative Claims) and Professional Claims.

Section II.C. of the Plan provides that all requests for approval of Professional Claims must be filed with the Bankruptcy Court and served upon the District no later than thirty (30) days after the date on which the Notice of Effective Date is mailed pursuant to the Plan. The same date shall apply to administrative expenses other than ordinary course administrative expenses.

### 2.    Revenue Bonds - Class 1

The District is obligated on revenue bonds held by bondholders in Class 1. Bank of New York Mellon is the indenture trustee of these 2006 A and B bonds. All payments are current to Class 1 bondholders. These revenue bonds are secured by certain personal property. On December 23, 2009, the Court approved a compromise with Bank of New York Mellon relating to the treatment of these bonds.

By virtue of the said order the District agreed these revenue bonds

1 would be unimpaired and paid in full with principal and interest, in accordance with

2 the terms of the existing bond instruments.

3     These revenue bonds are unimpaired by the Plan. The Plan leaves the

4 legal, equitable and contractual terms of these revenue bonds unaltered.

5 Bondholders in Class 1 do not vote on confirmation of the Plan.

6     From the proceeds of sale received from AH there will be deposited

7 sufficient funds to defease the Class1 bonds. The actual terms of the defeasance

8 will be separately documented between the District and Bank of New York Mellon.

9          **3.     General Obligation Bonds - Classes 2, 3 and 4**

10     The District is obligated on the General Obligation Bonds held by

11 bondholders in Classes 2, 3 and 4.

12     The Court previously approved certain compromises relating to the

13 treatment of these General Obligation Bonds by orders dated September 13, 2010

14 and January 13, 2011.

15     By virtue of these orders, the District agreed that the General Obligation

16 Bonds shall be paid in full, with principal and interest, in accordance with the terms

17 of the existing bond instruments.

18     These General Obligation Bonds are unimpaired by the Plan. The Plan

19 leaves the legal, equitable and contractual terms of these general obligation bonds

20 unaltered. Bondholders in Classes 2, 3 and 4 do not vote on confirmation of the

21 Plan.

22          **4.     Interests of Social Security Alternative**
          **Plan #1 Plan - Class 5.**

23

24     This alternative benefit plan commenced in 1982 and was last amended

25 in 2002 and frozen in 2010. The District failed to remit its contributions to the

26 Participants' SSA #1 accounts. It also failed to remit the amounts withheld from the

27

28

1   employees' pay for their contributions to the Plan.  The five original plan trustees

2   have resigned.  Contributions to SSA Plan #1 were suspended effective November

3   1, 2010 simultaneous with the establishment of SSA Plan #2.  The District has

4   acknowledged owing $1,314,998 on Class 5 claims as provided by Court Orders.

5          On the Effective Date, by compromise agreement with the SSA Plan #1

6   Successor Trustees,  the District will pay $1,314,998 to the Successor Trustees of

7   the SSA #1 Plan.  Said sums shall be paid to the Successor Trustees who shall

8   deposit the same in accordance with applicable law and give the required notices to

9   all such Class 5 claimants.  The District and its officers, directors and all related

10  persons, except for Lee Scott and MFS Securities, will be released from any claims

11  on account of the administration of this Plan.  Accordingly, the treatment of Allowed

12  Class 5 Claims set forth in the Plan does not affect any legal, equitable or contractual

13  rights to which the SSA #1 Plan participants are entitled.  These claims are

14  unimpaired and do not vote on confirmation.  Based on this treatment, the District is

15  informed that the Successor Trustees will consent to this treatment.

16          **5.     Zumwalt Construction, Inc. - Class 6**

17          Zumwalt Construction, Inc. shall have claims in Class 6.

18          By virtue of the compromise settlement reached on September 12, 2011

19  ZCI will pay MSI on its pass through claim, receive all remaining retainages of the

20  construction project, receive $332,114 on or before the Effective Date on account of

21  the bond proceeds funds diverted from it, be allowed a claim for $625,000 which will

22  be paid in Class 6 prior to December 31, 2012 and prior to Class 9 and it will waive

23  all other claims against the District.

24          This results in elimination of MSI's pass through claim filed in the

25  amount of $791,150 and a sharp reduction in ZCI's claims against the District.

26          The District's objections and counter claims against ZCI and MSI will be

27

1    dismissed. Class 6 is impaired and has the right to vote on the Plan.

2              **6.       United States Department of Agriculture  - Class 7**

3              The USDA was owed $1,483,523 as of July 23, 2011 which debt is

4    secured by a first deed of trust on 550 W. Cypress, Reedley, California. The Class

5    7 monthly payment is $10,140 per month, is current and will remain current and

6    unimpaired. Class 7 does not vote on confirmation.

7              **7.       Administrative Convenience Claims - Class 8**

8              Attached to the Plan as Exhibit B is a spreadsheet showing the claims

9    included in Class 8. Class 8 claims are Allowed General Unsecured Claims in an

10   amount not exceeding $3,000 totaling $59,081. Class 8 Allowed Claims shall be paid

11   in full within fourteen days of the Effective Date.

12             Class 8 is unimpaired by this Plan and, accordingly, the holders of Class

13   8 claims do not vote their Allowed Administrative Convenience Claims to accept or

14   reject the Plan.

15             **8.       General Unsecured Creditors - Class 9.**

16             The Plan classifies most general unsecured claims in Class 9.

17             Exhibit C shows the general unsecured claims that have been allowed

18   by the Debtor, totaling about $3,000,000. There are other "unknown," "unliquidated,"

19   "to be determined" and disputed claims including Jablonsky, the remaining

20   construction litigation, SSA Plan #1, personal injury claims and claims stemming from

21   rejections of executory contracts. The District estimates the Class 9 claims ultimately

22   allowed will range between $3,000,000 and $4,000,000.

23             The holders of Allowed Claims in Class 9 will receive their <u>pro rata</u> share

24   of about $800,000 per year until paid in full without interest. Payment will commence

25   on the first anniversary of Confirmation or December 31, 2012, whichever is earlier.

26             Based on its analysis, the District believes it is possible to pay all of the

27

1  Class 9 claims within 3.25 to 4.0 years after the first payment on or before December

2  31, 2012, however, the actual length of time cannot be determined until the pending

3  disputes, claims objections and litigation are finally resolved.  Class 9 is impaired and

4  entitled to vote to accept or reject the Plan.

5              **9.      Dental Surgery Center Partnership Claims - Class 10**

6              Class 10 consists of the claims against the District arising from the

7  dental surgery center partnership.   These claims have been satisfied by Bloss

8  Memorial Health Care District and there shall be no distribution from the District.

9        **B.    Treatment of Executory Contracts and Unexpired Leases.**

10             **1.      Generally.**

11             The Bankruptcy Code empowers debtors, subject to the approval of the

12  Bankruptcy Court, to assume or reject the Debtor's executory contracts and

13  unexpired leases.  An "executory contract" generally means a contract under which

14  material performance other than the payment of money is due by the parties.

15             If an executory contract or unexpired lease is rejected by the Debtor, the

16  rejection operates as a pre-petition breach of such agreement. If an executory

17  contract or unexpired lease is assumed by the Debtor, the assumption obligates the

18  Debtor to perform under the agreement, and damages arising for any subsequent

19  breach of the agreement are treated as administrative expenses.

20             **2.      Assumption.**

21             As a part of the Transaction, AH must notify the District in writing of any

22  executory contract or unexpired lease that AH has elected to assume. Subject to all

23  conditions set forth in the ASA, the District will include such executory contracts and

24  unexpired leases in the Assumption Assignment Motion that will seek authority to

25  assume and immediately assign such executory contracts and unexpired non

26  residential real property leases to AH.  See Exhibit D to the Plan for a spreadsheet

27

28

setting out the leases and executory contracts to be assumed or rejected.

In this case there are executory contracts and unexpired non residential real property leases that the District will assume but not assign.

### a.　Cure Payments and Future Performance.

After the provision of notice and the opportunity for a hearing on the Assumption/Assignment Motion, the Bankruptcy Court will resolve any disputes regarding: (a) the amount of any cure payment to be made in connection with the assumption of any contract or lease; (b) the ability of AH to provide "adequate assurance of future performance" within the meaning of Section 365 of the Bankruptcy Code under the contract or lease to be assumed; and (c) any other matter pertaining to such assumption and assignment.

### 3.　Rejection.

The District will file the Rejection Motion, pursuant to Section 365(a) of the Bankruptcy Code, to seek approval and authorization for the rejection of such executory contracts and unexpired leases that AH has not elected to assume, which the District, in the exercise of its business judgment, deems warranted. The District anticipates rejecting any executory contract and unexpired lease not previously requested that is not needed for it to continue operating as a local healthcare district.

### a.　Deadline for the Assertion of Rejection Damage Claims; Treatment of Rejection Damage Claims.

All proofs of Claims arising from the rejection of executory contracts or unexpired leases must be filed with the Bankruptcy Court and served on the District no later than thirty (30) days after the date on which notice of entry of the order approving the rejection is mailed. Any Claim for which a proof of Claim is not filed and served within such time will be forever barred and shall not be enforceable against the District or its assets, properties, or interests in property. Unless otherwise

1　ordered by the Bankruptcy Court, all such Claims that are timely filed as provided

2　herein shall be classified into Class 9 and treated accordingly.

3　　　**C.　　Means for Execution and Implementation of the Plan.**

4　　　　　Upon consummation of the Transaction, AH will provide the following

5　combination of cash and assumption of liabilities to enable the District to implement

6　the Plan and satisfy its obligations under the Plan.　See below for a summary of the

7　uses of the AH Transaction proceeds and future distributions under the Plan:

8　　　　　As is noted above, the Debtor will make various distributions of the AH

9　Transaction proceeds including the lease payments and *ad valorem* tax revenues.

10　　　　　How long it will take to pay all of the Class 9 claims will depend on the

11　ultimately allowed amounts of these Class 9 claims.

12　　　　　Therefore, for purposes of determining how long it will take to pay out

13　on the Class 9 claims, the Debtor believes it could be as short as 3.25 years or as

14　long as 4.0 years from the initial distribution based on distributions of $800,000 per

15　year.

16　　　　**1.　　Rights of Action.**

17　　　　　The Plan provides for the retention of all of the District's claims, causes

18　of action, rights of recovery, rights of offset, recoupment rights to refunds and similar

19　rights.　Unless a cause of action is expressly waived, relinquished, released,

20　compromised or settled in this Plan, the District expressly reserves all such rights for

21　later adjudication and, as a result, no preclusion doctrine, including the doctrines of

22　res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial,

23　equitable or otherwise) or laches, shall apply to such rights upon or after the

24　confirmation or consummation of this Plan or the Effective Date.

25　　　**D.　　Distributions.**

26　　　　　The District shall retain agents to perform or assist it in carrying out the

27

28

1   administration of the Plan, which agents may serve without bond.  The initial agent

2   shall be designated by the Board prior to Confirmation.  (The District itself will

3   continue to be managed by the Board and advised by District counsel.)  The District

4   may provide reasonable compensation to such agent(s) without further notice or

5   Court approval.  All distributions to any holder of an Allowed Claim shall be made at

6   the address of such holder as set forth in the books and records of the District, unless

7   the District has been notified by such holder in a writing that contains an address for

8   such holder different from the address reflected in its books and records.   All

9   distributions to the Bondholders shall be made in accordance with the documents

10  that govern distributions on the Bonds by the persons charged with this responsibility.

11          **1.      Undeliverable Distributions.**

12          ***Holding Of Undeliverable Distributions***.  If any distribution to any

13  holders is returned as undeliverable, no further distributions shall be made to such

14  holder unless and until the District is notified in writing of such holder's then-current

15  address.  Unless and until the District is so notified, such distribution shall be deemed

16  to be "Unclaimed Property."

17          ***Unclaimed Property***.  If any claimant entitled to receive distributions

18  pursuant to the Plan does not present itself on the Effective Date or on such other

19  date on which such claimant becomes eligible for distribution, such distributions shall

20  be deemed to be "Unclaimed Property."  Unclaimed Property shall be set aside and

21  held by the District in a segregated account to be maintained by the District pursuant

22  to the terms of the Plan.

23          If any distribution is returned as undeliverable, the District will file with

24  the Bankruptcy Court a list of Unclaimed Property, together with a schedule that

25  identifies the name and last-known address of holders of the Unclaimed Property; the

26  District otherwise will not be required to attempt to locate any such claimant entity.

27

28

DISCLOSURE STATEMENT FOR THE PLAN OF
ADJUSTMENT DATED AS OF SEPTEMBER 15, 2011          36          M:\S-U\Sierra Kings Health Care
District\Confirm\Final\DisclosureStatement.
ptw.092811.wpd

On the fourth anniversary of the Effective Date, all remaining Unclaimed Property and accrued interest or dividends earned thereon will be remitted to and vest in the District.

### 2. Timeliness of Payments.

Any payments or distributions to be made pursuant to the Plan shall be deemed to be timely made if made within thirty calendar (30) days after the dates specified in the Plan.

### 3. Compliance with Tax Requirements.

The District will comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant to the Plan will be subject to such withholding and reporting requirements. In connection with each distribution with respect to which the filing of an information return (e.g., Internal Revenue Service Form 1099) or withholding is required, the District shall file such information return with the Internal Revenue Service and provide any required statements in connection therewith to the recipients of such distribution, or effect any such withholding and deposit all moneys so withheld to the extent required by law.  With respect to any entity from whom a tax identification number, certified tax identification number, or other tax information required by law to avoid withholding has not been received by the District, the District at its sole option, may withhold the amount required and distribute the balance to such entity or decline to make such distribution until the information is received.

### 4. Time Bar to Cash Checks.

Checks issued by the District on account of allowed claims will be null and void if not negotiated within ninety (90) days from and after the date of issuance thereof.  Requests for reissuance of any check shall be made directly to the District by the holder of the allowed claim with respect to which such check originally was

1    issued.  Any claim in respect of such a voided check must be made on or before the

2    second anniversary of the Effective Date.  After such date, all claims in respect of

3    voided checks will be discharged and forever barred and the District will retain all

4    moneys related thereto.

5              **5.      No *De Minimis* Distributions.**

6              Notwithstanding any other provision of the Plan, no payment of less than

7    twenty-five dollars ($25) will be made by the District on any account of any allowed

8    claim.

9              **6.      No Distribution on Account of Disputed Claims.**

10             No distributions shall be made on account of any part of any Disputed

11   Claim until such Claim becomes Allowed (and then only to the extent so Allowed).

12   Distributions made after the Effective Date in respect of Claims that were not Allowed

13   as of the Effective Date (but which later became Allowed) shall be deemed to have

14   been made as of the Effective Date.

15             **7.      No  Post Petition Interest Accrual.**

16             Unless otherwise specifically provided in the Plan or allowed by order

17   of the Bankruptcy Court, the District will not be required to pay to any holder of a

18   claim any interest, penalty or late charge accruing with respect to such claim on or

19   after the Petition Date.

20             **8.      Insurance Proceeds.**

21             All distributions under the Plan will be net of any insurance proceeds

22   actually received in payment of any Claim that otherwise is allowed and entitled to a

23   distribution.

24       **E.     Disputed Claims.**

25             **1.      Claims Objection Deadline.**

26             The District will have the right to object to the allowance of claims filed

27

28

with the Bankruptcy Court with respect to which liability or allowance is disputed in whole or in part. Unless otherwise ordered by the Bankruptcy Court, the District must file and serve any such objections to claims by not later than ninety (90) days after the Effective Date (or, in the case of claims lawfully filed after the Effective Date, by not later than ninety (90) days after the date of filing of such claims).

### 2. Reserves, Payments, and Distributions with Respect to Disputed Claims.

At such time as a disputed claim becomes an allowed claim, in whole or in part, the District or its agent will distribute to the holder thereof the distributions, if any, to which such holder is then entitled under the Plan. Such distributions, if any, will be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing such disputed claim becomes a Final Order (or such other date as the claim becomes an allowed claim), but in no event more than thirty (30) days thereafter. Unless otherwise specifically provided in the Plan or allowed by order of the Bankruptcy Court, no interest will be paid on Disputed Claims that later become Allowed Claims.

### F. Continuing Jurisdiction of the Bankruptcy Court.

The Plan provides for the Bankruptcy Court to retain jurisdiction over a broad range of matters relating to the Chapter 9 Case, the Plan, and other related items. Readers are encouraged to review the Plan carefully to ascertain the nature of the Bankruptcy Court's continuing post-Effective Date jurisdiction.

### VIII.
### CONFIRMATION AND EFFECTIVENESS OF THE PLAN

Creditors concerned with issues regarding confirmation of the Plan should consult with their own attorneys and financial advisors. The following discussion is intended solely for the purpose of providing basic information concerning certain

1  confirmation issues. The District cannot and does not represent that the discussion

2  contained below is a complete summary of the law on this topic.

3        Many requirements must be met before the Bankruptcy Court may confirm the

4  Plan. Some of the requirements discussed in this Disclosure Statement include

5  acceptance of the Plan by the requisite number of creditors, and whether the Plan is

6  in the "best interests" of creditors. These requirements, however, are not the only

7  requirements for confirmation, and the Bankruptcy Court will not confirm the Plan

8  unless and until it determines that the Plan satisfies all applicable requirements,

9  including requirements not referenced in this Disclosure Statement.

10       **A.    Voting and Right to be Heard at Confirmation.**

11            **1.    Who May Support or Object to Confirmation of the Plan?**

12        Any party in interest may support or object to the confirmation of the

13  Plan. Even entities who may not have a right to vote (e.g., entities whose claims are

14  classified into an unimpaired Class) may still have a right to support or object to

15  confirmation of the Plan.

16            **2.    Who May Vote to Accept or Reject the Plan?**

17        A creditor generally has a right to vote for or against the Plan if its Claim

18  is both Allowed for purposes of voting and is classified into an impaired Class.

19  Generally, a claim is deemed allowed if a proof of claim was timely filed, provided,

20  however, that if an objection to a claim has been filed, the claimant cannot vote

21  unless the Bankruptcy Court, after notice and hearing, either overrules the objection

22  or allows the claim for voting purposes. Thus, the definition of "Allowed Claim" used

23  in the Plan for purpose of determining whether creditors are entitled to receive

24  distributions is different from that used by the Bankruptcy Court to determine whether

25  a particular claim is "allowed" for purposes of voting. Holders of claims are advised

26  to review the definitions of "Allowed," "Claim," and "Disputed" set forth in Section I.A.

27

of the Plan to determine whether they may be entitled to vote on, and/or receive distributions under the Plan.

### 3.    Who is not Entitled to Vote?

The holders of the following types of claims are not entitled to vote on the Plan: (a) claims that have been disallowed; (b) claims that are subject to a pending objection and which have not been allowed for voting purposes; (c) claims that are not impaired; and (d) Administrative Expense Claims, since such claims are not placed in Classes and are required to receive certain treatment specified by the Bankruptcy Code.

### 4.    Vote Necessary to Confirm the Plan.

The Bankruptcy Court cannot confirm the Plan unless, among other things, (a) at least one impaired Class has accepted the Plan without counting the votes of any insiders within that Class; and (b) either all impaired Classes have voted to accept the Plan, or the Plan is eligible to be confirmed by "cramdown" with respect to any dissenting impaired Class.

A Class of claims is considered to have accepted the Plan when more than one-half in number and at least two-thirds in dollar amount of the claims that actually voted in that Class have voted in favor of the Plan.

### B.    The "Best Interests" Test.

The Bankruptcy Court also must determine that the Plan is in the "best interests of creditors" pursuant to Section 943(b)(7) of the Bankruptcy Code, which in the Chapter 9 context means that treatment under the Plan must be better than the one alternative available, which is dismissal of the case.  Dismissal permits every creditor to fend for itself in the race to the courthouse, since a court supervised liquidation under chapter 7 is not a permissible Chapter 9 alternative.

The District submits that the Plan is in the best interests of all creditors

1   because significant payments will be made to all impaired Classes. See District's

2   Projected Financials at Exhibit E to the Plan. The Plan devotes all or nearly all of the

3   consideration obtained on account of those assets that the District is legally entitled

4   to sell to the repayment of the District's creditors. The District has obtained a fair

5   price for its assets, and the Plan will therefore result in the satisfaction of the Bonds,

6   the payment of administrative claims, and payment of a substantial amount on

7   account of allowed unsecured claims, albeit over time. By implementing the ASA, the

8   District will be able to convey its hospital assets as a going concern. As a going

9   concern, the value of the District's assets is enhanced by several factors, including

10   the experience and talent of employees, the value of assembled contracts and

11   equipment, and the connections of the business to the community and other

12   providers. The Plan allows the District to realize that value, and distribute it to its

13   creditors.

14          In contrast, in the absence of the Plan, the District's creditors would be

15   left to "fend for themselves." Individual creditor collection efforts would likely

16   aggregate, through suits and attachments, to make continued operation of the District

17   untenable, thus diminishing the value of the District's business. Without operating

18   health care facilities, the value of the District's assets would consist of only the value

19   of empty buildings, raw land and used equipment. Instead, those creditors able to

20   pursue litigation most quickly would benefit at the expense of others, and, indeed, the

21   total value may be insufficient to repay the Bonds.

22          Moreover, the Plan preserves the availability of healthcare services to

23   residents under the auspices of AH, while the free-for-all that would occur in the

24   absence of the Plan and possibility that operations will cease would work to the

25   severe detriment of the District's residents.

26   //

27

28   DISCLOSURE STATEMENT FOR THE PLAN OF
     ADJUSTMENT DATED AS OF SEPTEMBER 15, 2011          42          M:\S-U\Sierra Kings Health Care
     District\Confirm\Final\DisclosureStatement.
     ptw.092811.wpd

1    **C.    Feasibility.**

2        To satisfy the requirement set forth in Bankruptcy Code Section

3    943(b)(7) that the Plan be feasible, the District must demonstrate the ability to make

4    the payments required under the Plan and still maintain its operations at the level that

5    it deems necessary to the continued viability of the health care district.

6        The District submits that the Plan is feasible.  Under the Transaction,

7    the ability to make the payments required by the Plan turns on the ability of AH to

8    close that Transaction,

9        The District has negotiated a fair price for sale of substantially all of its

10    assets, and will distribute the consideration received as set forth in the Plan.  The

11    District will continue in a limited fashion after consummating the Transaction, which

12    limited operations will be funded by future payments from AH rents to be received,

13    and future tax revenues, and possible grants.

14    **D.    "Cramdown."**

15        The Bankruptcy Code provides that the Bankruptcy Court may confirm

16    a plan of adjustment that is not accepted by all impaired classes if at least one

17    impaired Class of claims accepts the Plan and the so-called "cramdown" provisions

18    set forth in Sections 1129(b)(l), (b)(2)(A) and (b)(2)(B) of the Bankruptcy Code are

19    satisfied.  The Plan may be confirmed under the cramdown provisions if, in addition

20    to satisfying the other requirements of Section 943(b) of the Bankruptcy Code, it (a)

21    is "fair and equitable", and (b) does not discriminate unfairly with respect to each

22    Class of claims that is impaired under and has not accepted the Plan.

23        The "fair and equitable" standard, also known as the "absolute priority

24    rule," requires, among other things, that unless a dissenting unsecured Class of

25    claims receives payment in full for its allowed claims, no holder of allowed claims in

26    any Class junior to that Class may receive or retain any property on account of such

27

claims. The "fair and equitable" standard also has been interpreted to prohibit any class senior to a dissenting Class from receiving more than 100% of its allowed claims under a plan. The District believes that the Plan satisfies the "fair and equitable" standard because, among other things, no classes junior to the classes of unsecured claims are receiving or retaining any property under the Plan, and the holders of Allowed Claims in Classes are not receiving more than 100% payment of their allowed claims.

The requirement that the plan not "discriminate unfairly" means, among other things, that a dissenting Class must be treated substantially equally with respect to other Classes of equal rank. The District does not believe that the Plan unfairly discriminates against any Class that may not accept or otherwise consent to the Plan.

As noted above, the District has reserved the right to request the Bankruptcy Court to confirm the Plan by "cramdown" in accordance with Sections 1129(b)(1), (b)(2)(a) and (b)(2)(b). The District also has reserved the right to modify the Plan to the extent, if any, that confirmation of the Plan under Sections 943 and 1129(b) of the Bankruptcy Code requires such modifications.

### E. Effective Date.

#### 1. Conditions to the Occurrence of the Effective Date.

The Plan will not become effective and operative unless and until the Effective Date occurs. Section XII of the Plan sets forth certain conditions to the occurrence of the Effective Date. The District may waive in whole or in part the condition regarding agreements and instruments contemplated by, or to be entered into pursuant to, the Plan. Any such waiver of a condition may be effected at any time, without notice or leave of order of the Bankruptcy Court and without any formal action, other than the filing of a notice of such waiver with the Bankruptcy Court.

The Effective Date will occur on the first Business Day after which the

1  conditions set forth in Section XII.B. of the Plan are satisfied or waived; *provided* that

2  the Effective Date must occur by no later than four months after the Confirmation

3  Date, unless extended by court order.

4          **2.    Non-Occurrence of Effective Date.**

5          The Plan provides that, if confirmation occurs but the Effective Date

6  does not occur within the period authorized by the Plan or court order, upon

7  notification submitted by the District to the Bankruptcy Court: (a) the Confirmation

8  Order shall be vacated; (b) no distributions under this Plan shall be made; (c) the

9  District and all holders of Claims shall be restored to the *status quo* as of the day

10  immediately preceding the Confirmation Date as though the Confirmation Date never

11  occurred; and (d) all of the District's obligations with respect to the Claims shall

12  remain unchanged and nothing contained herein shall be deemed to constitute a

13  waiver or release of any claims by or against the District or any other entity or to

14  prejudice in any manner the rights of the District or any entity in any further

15  proceedings involving the District.   The failure of the Effective Date to occur,

16  however, will not affect the validity of any order entered in the Chapter 9 Case other

17  than the Confirmation Order.

18          **F.    Effect of Confirmation.**

19          Section X of the Plan provides that confirmation of the Plan and the

20  occurrence of the Effective Date will have a number of important and binding effects,

21  some of which are summarized below.   Readers are encouraged to review Section

22  X of the Plan carefully and in its entirety to assess the various consequences of

23  confirmation of the Plan.

24          **1.    Discharge of the District.**

25          Pursuant to Section 944 of the Bankruptcy Code, on the Effective Date,

26  the District will be discharged from all debts (as defined in the Bankruptcy Code) of

27

1    the District and claims against the District other than (a) any debt specifically and

2    expressly excepted from discharge by the Plan or the Confirmation Order, or (b) any

3    debt owed to an entity that, before the confirmation of the Plan, had neither notice nor

4    actual knowledge of the Chapter 9 Case.

5           The rights afforded in the Plan and the treatment of claims will be in

6    exchange for and in complete satisfaction, discharge and release of all claims of any

7    nature whatsoever arising on or before the Effective Date, known or unknown,

8    including any interest accrued or expenses incurred thereon from and after the

9    Petition Date, whether against the District or any of its properties, assets, or interests

10    in property.  Except as otherwise provided in the Plan, on the Effective Date, all

11    claims against the District will be deemed to be satisfied, discharged and released

12    in full.

13          **2.**      **Injunction.**

14           The Plan provides that all entities who have held, hold or may hold

15    pre-Effective Date claims will be permanently enjoined, from and after the Effective

16    Date, from (a) commencing or continuing in any manner any action or other

17    proceeding of any kind with respect to any such pre-Effective Date claim against the

18    District; (b) enforcing, attaching, collecting, or recovering by any manner or means

19    any judgment, award, decree or order against the District with respect to such

20    pre-Effective Date claims; (c) creating, perfecting, or enforcing any lien or

21    encumbrance of any kind against the District or its property or interests in property;

22    and (d) asserting any right of setoff, subrogation or recoupment of any kind against

23    any obligation due to the District with respect to any such pre-Effective Date claim,

24    except as otherwise permitted by Section 553 of the Bankruptcy Code.

25          **3.**      **Term of Existing Injunctions and Stays.**

26           The Plan provides that all injunctions or stays provided for in the

27

28

1    Chapter 9 Case pursuant to Sections 105, 362, or 922 of the Bankruptcy Code, or

2    otherwise, and in existence on the Confirmation Date, will remain in full force and

3    effect until the Effective Date.

## IX.
## CERTAIN RISK FACTORS TO BE CONSIDERED

6    Holders of claims against the District should read and consider carefully the

7    factors set forth below, as well as the other information set forth in this Disclosure

8    Statement and the documents delivered with this Disclosure Statement and/or

9    incorporated by reference, prior to voting to accept or reject the Plan. These risk

10   factors should not, however, be regarded as constituting the only risks involved in

11   connection with the Plan and its implementation.

12   One of the risks involved in the Transaction is that AH will not be able

13   to obtain the financing or cash necessary to close the sale.  The District has

14   investigated the financial statements of AH, and its bond rating and believes this will

15   not be an impediment to closing.

16   There is also a risk that the amount of allowed administrative expenses,

17   priority claims and other general unsecured claims may be greater than currently

18   estimated, in which case distributions to creditors may be reduced or the period of

19   time for payment extended.

## X.
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES

22   **A.    Introduction.**

23   The implementation of the Plan may have federal, state, local and

24   foreign tax consequences to the District and its creditors.  No tax opinion has been

25   sought or will be obtained with respect to any tax consequences of the Plan. This

26   Disclosure Statement does not constitute and is not intended to constitute either a

1   tax opinion or tax advice to any person, and the summary contained herein is

2   provided for informational purposes only.

3          The discussion below addresses the potential material federal tax

4   consequences of the Plan to the District and a hypothetical investor typical of the

5   holders of Claims in this case.  This discussion does not attempt to consider various

6   facts or limitations applicable to any particular creditor which may modify or alter the

7   consequences described herein.  A creditor may find that the tax consequences of

8   the Plan to such creditor differ materially from the tax consequences discussed below

9   because of such creditor's facts and circumstances.  This discussion does not

10  address state, local or foreign tax consequences.

11         The following discussion is based upon the provisions of the Internal

12  Revenue Code of 1986, as amended (the "Internal Revenue Code"), the regulations

13  promulgated thereunder, existing judicial decisions and administrative rulings.  In light

14  of the rapidly-changing nature of tax law, no assurance can be given that legislative,

15  judicial or administrative changes will not be forthcoming that would affect the

16  accuracy of the discussion below.  Any such changes could be material and could be

17  retroactive with respect to the Transactions entered into or completed prior to the

18  enactment or promulgation thereof.  The tax consequences of certain aspects of the

19  Plan are uncertain due to the lack of applicable legal authority and may be subject

20  to judicial or administrative interpretations that differ from the discussion below.

21         You are hereby notified that (1) any discussion of federal tax issues in

22  this Disclosure Statement is not intended or written to be relied upon, and cannot be

23  relied upon by you, for the purpose of avoiding penalties that may be imposed on you

24  under the Internal Revenue Code, and (2) such discussion is written in connection

25  with the solicitation of votes in favor of the Plan.

26         **CREDITORS ARE ADVISED TO CONSULT WITH THEIR OWN TAX**

27

ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM AND TO THE DISTRICT OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN.

**B.      Federal Income Tax Consequences to the District.**

**1.      Tax Consequences of the District's Sale of Assets.**

The Plan provides for the sale of District assets to AH pursuant to the terms of the ASA and the Plan.  A sale generally is a recognition event for federal income tax purposes and requires the seller to recognize and report gain or loss measured by the difference between the amount realized and the adjusted tax basis of the sold assets.  However, Internal Revenue Code Section 115 provides that gross income does not include "income derived from the exercise...of any essential governmental function and accruing to a State or any political subdivision thereof... "  If Internal Revenue Code Section 115 applies to the District's sale of assets under the ASA, any income or gain realized by the District upon such sale would be excluded from the District's gross income.

Based upon the foregoing, the District anticipates that it will not report for federal income tax purposes any income, gain, loss, deduction or credit (or item thereof) realized or recognized by it in connection with its sale of assets.  The District also anticipates that, in conformity with past practice, it will not file any federal corporate income tax returns with respect to the tax period in which the sale of assets falls.

**2.      Reduction of the District's Indebtedness.**

As a result of the Plan's implementation, it is possible that not all creditors holding valid Claims will be paid in full.  The District anticipates that any unpaid balance will be discharged pursuant to Bankruptcy Code Section 944.  (Any amount of potential discharged indebtedness for federal income tax purposes will be referred to herein as a "Debt Discharge Amount").  In general, the Internal Revenue

1    Code provides that a taxpayer who realizes a discharge of indebtedness must include

2    the Debt Discharge Amount in its gross income in the taxable year of discharge to the

3    extent that the Debt Discharge Amount exceeds any consideration given for such

4    discharge.  No income from the discharge of indebtedness is realized to the extent

5    that payment of the liability being discharged would have given rise to a deduction.

6          If a taxpayer is in a title 11 case and the discharge of indebtedness

7    occurs pursuant to a plan approved by the court, such discharge of indebtedness is

8    specifically excluded from gross income (the "Bankruptcy Exception").

9         **3.    Tax Consequences to Creditors.**

10        Creditors should confer with their own tax advisors as to the tax

11   consequences of Plan confirmation.

12        **a.    Withholding.**

13        The District will withhold any amounts required by law from payments

14   made to creditors. This may require payments by certain creditors of the required

15   withholding tax on the non-cash consideration issuable or deemed issuable under the

16   Plan.  In addition, creditors may be required to provide general tax information to the

17   District, and any failure by a creditor to comply with such a request may entitle the

18   District to withhold any and all distributions to such creditor until full compliance with

19   the District's request for information is achieved.

20   **XI.**
     **RECOMMENDATION AND CONCLUSION**

21

22        The District believes that confirmation and implementation of the Plan is

23   preferable to all other available and feasible alternatives.  Accordingly, the District

24   //

25   //

26   //

27

28

urges holders of impaired claims to vote to accept the Plan by so indicating on their

ballots and returning them as specified in this Disclosure Statement.

Dated: September 29 2011

Respectfully submitted,
Sierra Kings Health Care District

By: _____
Sanford Haskins
Interim Chief Executive Officer

Dated: September 29 2011

_____
Kathleen Omachi, Chair of Board of
Directors

Dated: September 29, 2011

WALTER & WILHELM LAW GROUP
a Professional Corporation

By: _____
Riley C. Walter, Attorneys for Sierra
Kings Health Care District

Dated: September 29 2011

FISHMAN, LARSEN, GOLDRING &
ZEITLER

By: _____
Michael W. Goldring, General Counsel
for Sierra Kings Health Care District

## **EXHIBITS**

**Exhibit A**     Letter of Intent/ASA

**Exhibit B**     Spreadsheet of Class 8 Claims

**Exhibit C**     Spreadsheet of Class 9 Claims

**Exhibit D**     Leases/Executory Contracts - Assumed and Rejected

# TABLE OF CONTENTS

I.

OVERVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.

SUMMARY OF THE PLAN . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III.

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
A.     The Purpose of this Disclosure Statement. . . . . . . . . . . . . . . 7
B.     Voting on the Plan and of Certain Requirements Necessary for Confirmation of the Plan. . . . . . . . . . . . . . . . . . . . . . 8
C.     Voting Procedures, Balloting Deadline, Confirmation Hearing, and Other Important Dates; Deadlines, and Procedures. . . . . . . . . . 9
    1.     Voting Procedures And Deadlines. . . . . . . . . . . . . . . . 9
    2.     Date of the Confirmation Hearing and Deadlines for Objection to Confirmation of the Plan. . . . . . . . . . . . . . . . . . 9
D.     Important Notices and Cautionary Statements. . . . . . . . . . . . 10
E.     Additional Information. . . . . . . . . . . . . . . . . . . . . . . 11

IV.

BACKGROUND INFORMATION . . . . . . . . . . . . . . . . . . . . . . . . 11
A.     The District. . . . . . . . . . . . . . . . . . . . . . . . . . . 11
B.     District's Financial Problems. . . . . . . . . . . . . . . . . . . 14

V.

THE DISTRICT'S CHAPTER 9 CASE . . . . . . . . . . . . . . . . . . . . . 15
A.     Formation of the Committee. . . . . . . . . . . . . . . . . . . . 15
B.     Dissolution of the Dental Surgery Center Partnership. . . . . . . . 15
C.     Motions for Relief from the Stay, . . . . . . . . . . . . . . . . . 15
D.     Bond Compromises. . . . . . . . . . . . . . . . . . . . . . . . . 16
E.     Jablonsky Litigation. . . . . . . . . . . . . . . . . . . . . . . 16
F.     Lemus Litigation. . . . . . . . . . . . . . . . . . . . . . . . . 16
G.     Cordova Litigation. . . . . . . . . . . . . . . . . . . . . . . . 17
H.     Ocejo Litigation. . . . . . . . . . . . . . . . . . . . . . . . . 17
I.     Other Threatened Litigation. . . . . . . . . . . . . . . . . . . . 17
    1.     Herrera-Soto Litigation. . . . . . . . . . . . . . . . . . . . 17
    2.     Woolsley Litigation. . . . . . . . . . . . . . . . . . . . . . 18
    3.     SSA #1 Litigation/Compromise. . . . . . . . . . . . . . . . . 18
    4.     ZCI/MSI/Aspen Litigation/Compromise. . . . . . . . . . . . . . 18
J.     Borrowings. . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

VI.

THE DISTRICT'S LIABILITIES AND ASSETS . . . . . . . . . . . . . . . . . 20
A.     Liabilities. . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
    1.     Proofs of Claim. . . . . . . . . . . . . . . . . . . . . . . . 20
    2.     Administrative Expenses. . . . . . . . . . . . . . . . . . . . 20
    3.     Secured Claims. . . . . . . . . . . . . . . . . . . . . . . . 21
    4.     SSA Plan #1 Claims. . . . . . . . . . . . . . . . . . . . . . 21
    5.     Dental Surgery Center Partnership Claims. . . . . . . . . . . 21
    6.     Revenue Bonds. . . . . . . . . . . . . . . . . . . . . . . . . 21
    7.     General Obligation Bonds. . . . . . . . . . . . . . . . . . . 22
    8.     Aspen Street. . . . . . . . . . . . . . . . . . . . . . . . . 22
    9.     Administrative Convenience Claims. . . . . . . . . . . . . . . 23
    10.    General Unsecured Claims. . . . . . . . . . . . . . . . . . . 23

11.   Leases/Executory Contracts . . . . . . . . . . . . . . . . . . . . . . . . 23
12.   Statement Regarding Liabilities.  . . . . . . . . . . . . . . . . . . . . 24
B.   Assets.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

VII.
SUMMARY OF THE PLAN OF ADJUSTMENT   . . . . . . . . . . . . . . . . . . . 25
A.   Classification And Treatment of Claims. . . . . . . . . . . . . . . . . . . 28
   1.   Unclassified Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
      a.   Administrative Expense Claims.  . . . . . . . . . . . . . . . 28
      b.   Professional Claims.  . . . . . . . . . . . . . . . . . . . . . . 29
      c.   Bar Date for Assertion of Requests for Payment of
            Administrative Claims (Other than Ordinary Course
            Administrative Claims) and Professional Claims.  . . 29
   2.   Revenue Bonds - Class 1 . . . . . . . . . . . . . . . . . . . . . . . . 29
   3.   General Obligation Bonds - Classes 2, 3 and 4 . . . . . . . . . 30
   4.   Interests of Social Security Alternative Plan #1 Plan -
         Class 5.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
   5.   Zumwalt Construction, Inc. - Class 6  . . . . . . . . . . . . . . . 31
   6.   United States Department of Agriculture - Class 7  . . . . . . 32
   7.   Administrative Convenience Claims - Class 8  . . . . . . . . . 32
   8.   General Unsecured Creditors - Class 9. . . . . . . . . . . . . . . 32
   9.   Dental Surgery Center Partnership Claims - Class 10 . . . . 33
B.   Treatment of Executory Contracts and Unexpired Leases.   . . . . . 33
   1.   Generally.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
   2.   Assumption. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
      a.   Cure Payments and Future Performance.   . . . . . . . 34
   3.   Rejection.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
      a.   Deadline for the Assertion of Rejection Damage Claims;
            Treatment of Rejection Damage Claims.   . . . . . . . 34
C.   Means for Execution and Implementation of the Plan.   . . . . . . . . 35
   1.   Rights of Action.   . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
D.   Distributions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
   1.   Undeliverable Distributions. . . . . . . . . . . . . . . . . . . . . . . 36
   2.   Timeliness of Payments.  . . . . . . . . . . . . . . . . . . . . . . . 37
   3.   Compliance with Tax Requirements.  . . . . . . . . . . . . . . . 37
   4.   Time Bar to Cash Checks.  . . . . . . . . . . . . . . . . . . . . . . 37
   5.   No De Minimis Distributions. . . . . . . . . . . . . . . . . . . . . . 38
   6.   No Distribution on Account of Disputed Claims. . . . . . . . . 38
   7.   No  Post Petition Interest Accrual. . . . . . . . . . . . . . . . . . . 38
   8.   Insurance Proceeds.  . . . . . . . . . . . . . . . . . . . . . . . . . . 38
E.   Disputed Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
   1.   Claims Objection Deadline. . . . . . . . . . . . . . . . . . . . . . . 38
   2.   Reserves, Payments, and Distributions with Respect to Disputed
         Claims.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
F.   Continuing Jurisdiction of the Bankruptcy Court.   . . . . . . . . . . . . 39

VIII.
CONFIRMATION AND EFFECTIVENESS OF THE PLAN . . . . . . . . . . . 39
A.   Voting and Right to be Heard at Confirmation. . . . . . . . . . . . . . . 40
   1.   Who May Support or Object to Confirmation of the Plan?   40
   2.   Who May Vote to Accept or Reject the Plan?  . . . . . . . . . 40

          3.    Who is not Entitled to Vote? . . . . . . . . . . . . . . . . . . . . . 41
          4.    Vote Necessary to Confirm the Plan. . . . . . . . . . . . . . . 41
    B.    The "Best Interests" Test. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
    C.    Feasibility. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
    D.    "Cramdown." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
    E.    Effective Date. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
          1.    Conditions to the Occurrence of the Effective Date. . . . . 44
          2.    Non-Occurrence of Effective Date. . . . . . . . . . . . . . . . . . 45
    F.    Effect of Confirmation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
          1.    Discharge of the District. . . . . . . . . . . . . . . . . . . . . . . . . 45
          2.    Injunction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
          3.    Term of Existing Injunctions and Stays. . . . . . . . . . . . . . 46

IX.    CERTAIN RISK FACTORS TO BE CONSIDERED . . . . . . . . . . . . . . . . 47

X.     CERTAIN FEDERAL INCOME TAX CONSEQUENCES . . . . . . . . . . . 47
    A.    Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
    B.    Federal Income Tax Consequences to the District. . . . . . . . . . . 49
          1.    Tax Consequences of the District's Sale of Assets. . . . . . 49
          2.    Reduction of the District's Indebtedness. . . . . . . . . . . . . 49
          3.    Tax Consequences to Creditors. . . . . . . . . . . . . . . . . . . . 50
                a.    Withholding. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

XI.    RECOMMENDATION AND CONCLUSION . . . . . . . . . . . . . . . . . . . . . 50